No. 20,844.

SARAH CURTISS, *Appellee*, v. EMMA L. REAUME, doing business as The People's Light and Ice Plant, *Appellant.*

SYLLABUS BY THE COURT.

1. ELECTRICITY—*Death—Contact with Electric Wire—Findings.* Refusal to set aside certain findings complained of held proper.

2. SAME—*Judgment on Special Findings.* The refusal to render judgment for the defendant on the special findings was not error.

3. SAME—*Instructions.* The instructions given fully and correctly covered the law of the case, and the trial court committed no error in the refusal of those requested by the defendant.

4. SAME—*Verdict Sustained by Evidence.* The plaintiff's right to recover rested on the circumstances shown; the defense, on the testimony of one youthful witness naturally and admittedly frightened by

the tragedy out of which this case arose. *Held,* that the verdict, which was manifestly reached by force of the circumstances shown, having been approved by the trial court, can not be disturbed.

5. SAME—*New Trial Properly Denied.* No error appearing to have been committed during the trial, the motion for a new trial was properly denied.

Appeal from Ellsworth district court; DALLAS GROVER, judge. Opinion filed May 12, 1917. Affirmed.

*Ira E. Lloyd,* and *N. F. Nourse,* both of Ellsworth, for the appellant.

*Thomas L. Bond,* of Salina, and *Samuel E. Bartlett,* of Ellsworth, for the appellee.

The opinion of the court was delivered by

WEST, J.: The widow of John M. Curtiss brought this action to recover for his death caused by contact with one of the defendant's electric wires. The essential charge was that the defendant, who owns and operates the electric-light plant at Ellsworth, negligently failed to protect and insulate the wires, carelessly failed to guard them where they crossed the street and sidewalks and to insulate and protect them at points of contact with trees and branches. That a wire became burned, broken and disconnected about thirty feet north of the sidewalk on which the deceased was walking and fell to the ground along and upon the sidewalk, and as he was passing he came in contact with the wire and thereby received a shock causing his death. The answer alleged that John M. Curtiss was a laborer whose duties had been near the electric lines, that he well knew it was dangerous to touch or handle the wires;

"And well knowing that he should not touch said wire, the said John M. Curtiss did, carelessly and negligently, or knowingly and intentionally, touch, seize and handle said wire after it fell and after he had seen it fall, and after and at the time he heard and should have heard said loud buzzing and sizzling sound which said wire made on account of emitting electricity, and after and at the time he saw said wire emitting electricity and sparks."

Thus the issue was a direct one between death caused by the defendant's negligence and death caused by the negligence of the deceased himself. The jury found that Mr. Curtiss

had been informed that the wires were dangerous and that it would be fatal to any one who took hold of them or touched them; that he was told before the injury that it would kill him or be very dangerous to get tangled up in electric wires or handle them, and to report in case he saw any down. That preceding the injury his attention was called to the wire burning in the tree or the branches and that he saw the wire burning in the tree.

"5. Q. If you answer the preceding question yes, then did he see the wire fall to the ground after he saw it burning in the tree? A. Don't know.

"6. Q. If you answer questions numbered 3 and 4, yes, then state whether said Curtiss remarked that the wire burning in the tree was what caused the wire to break, and that it would have to be fixed, or words to that effect? A. Yes.

"7. Q. If you answer questions numbered 4, and 5, yes, then after seeing the wire fall and making the remark that it would have to be fixed, or words to that effect, did he pick up the wire? A. No."

The defendant moved to strike out the answer to finding No. 5 and also to strike out the answer to finding No. 7 as being contrary to the evidence, which motions were overruled. Motions for judgment on the findings and for new trial were overruled, and the defendant appeals.

The errors relied on in the brief are the denial of motions for judgment and to strike out findings Nos. 5 and 7, refusal to give requested instructions and refusal to grant a new trial.

While the findings indicate considerable knowledge of the situation by the deceased before the shock was received they contain nothing substantiating the defendant's claim of contributory negligence. Knowledge of the danger of contact with electric wires and knowledge that one of the company's wires was emitting sparks in a tree near the walk, and the remark that the wire burning in the tree was what caused it to break and that it would have to be fixed, fall far short of showing that contact with the wires by the deceased came about by his own procurement or negligence. It was the theory of the defense that Mr. Curtiss actually grasped the wire, thereby causing his death, but this was expressly negatived by the answer to question No. 7. Hence, the court did not err in refusing to render judgment on the findings.

As to the assertion that the answer to finding No. 5 was contrary to the evidence, the record shows that Mr. Klingen-

smith, the county clerk, saw the deceased working in the afternoon on the north side of the street. The next time he saw him where the alley comes down from the north; he was lying down, with his face up and in a dying condition; the wire "was wrapped around his hand, and ran across his arm, and across his breast and body." The body was lying with the head south and the feet on the sidewalk. The witness heard the buzzing sound, looked across the street, saw a blaze near the light pole on the north side of the street, went out of the west door of the courthouse, and crossing the street to the blaze there saw the man on the ground with his face up. This was about two and a half or three minutes after he first heard the buzzing sound. All the injuries, so far as the witness could see, were on the front part of the body.

"And he had one hand wrapped with the electric wire. The shovel was on the left, in the left arm, and the handle extended right across the breast."

Doctor Mayer testified that the wire was down across the front of the body inside of the fingers of both hands, across the left arm, underneath and over the top of the right arm, up across the body coming in contact with the chest, and from there it went on up towards the other wires above. The fingers of the right hand were burned down to the third phalange between the second and third joints, seared down that distance, and the left arm was burned almost in two, hanging by one tendon, and the right arm about the middle was burned down through the bony tissue. The chest was burned through the chest wall. The hand was burned from the inside. The hands were clenched over the wire and drawn up towards the breast. Alfred Obermowe, a boy about fourteen years old, testified that he was with Mr. Curtiss, who was standing on the sidewalk and picking around in the grass with his shovel.

"A. I went up and talked to him, and the wire fell, and he said something, and then he took hold of the wire and uttered a scream and fell over.

.     .     .     .     .     .     .     .     .     .     .     .

"A. He said—then the wire fell and he said, 'That is what made the wire break, and it would have to be fixed.'

.     .     .     .     .     .     .     .     .     .     .     .

"Q. After he said that what did he do? A. He stooped over and took hold of it.

Curtiss v. Reaume.

"Q. Then what happened? A. He took hold of it with one hand, and then with the other, and then he uttered a scream and fell over.

"Q. Tell the jury whether or not he had at that time any spade or shovel in his hand? A. He had a shovel in his hand, but as he took hold of the wire he leaned it against his arm."

The witness testified that he saw a wire burning in the tree and called the attention of the deceased to it, who could see it burning in the tree.

"It hung a minute on the branches and then it fell into the grass. . . . It made quite a loud noise as it was sizzling in the grass.

"Q. Did you see the light of it burning when he picked it up in the grass? A. Yes, sir.

"Q. How much did it burn in the grass ? A. I don't know if it burned in the grass, but I could see the sparks flying.

"Q. Was there anything to prevent Mr. Curtiss seeing the sparks flying? A. No, sir.

"Q. How long did you stay there before you went away, after Mr. Curtiss took hold of the wire? A. I didn't stay there but a few seconds.

"Q. Were you frightened? A. Yes, sir.

"Q. Did you holler, or anything of that kind? A. No, sir."

From this testimony, which is substantially all upon this point, the jury might have believed that the deceased saw the wire fall to the ground after he saw it burning in the tree or that he did not. Their answer indicates that they were not satisfied from the evidence that he did. No request was made for a more definite answer, and it was not error to refuse to set aside the answer returned.

As to finding No. 7, the jury had to choose between the evidence of Alfred Obermowe and the facts and circumstances shown. If the boy was not mistaken through excitement or imperfect vision, and his version of the matter is to be accepted, then it is clear that the deceased not only grasped the wire, but grasped it with one hand and then grasped it again with the other hand. In other words, he stooped over (forward), took hold of the wire with one hand and then took hold of it with the other, and then uttered a scream and fell over. It is plausibly argued that when stooping over forward and grasping so deadly a thing as a highly-charged electric wire, which must mean almost instantaneous death, he would fall forward; yet the testimony seems all to the effect that he was found lying on his back. There is further pressed the seeming

impossibility that one could grasp such a wire with one hand and have life and consciousness enough then to grasp it with the other hand, unless the latter action was purely spasmodic or involuntary. From the occurrence as described by the witness, or the situation as detailed by those who found and examined the body, the jury had to determine the fact. The circumstances seem to have had the greater convincing weight. (*Roediger v. Railroad Co.*, 95 Kan. 146, 147 Pac. 837.) Dr. Mayer testified that upon his observation of the contact of the wire with the body Mr. Curtiss was unconscious instantly, and that death occurred in a minute or a minute and a half, and that his death occurred within a few feet of the place where his hands came in contact with the wire. The conclusion of the jury, therefore, that the deceased did not pick up the wire after seeing it fall and making the remark that it would have to be fixed, could not be set aside save by the trial court's resolve to regard the circumstances less probative and convincing than the testimony of the boy who so fortunately escaped death, and whose natural and admitted fright may have unconsciously affected his sight and memory; and it is not for us to say that the jury and the court were wrong in their deduction from the entire evidence, direct and circumstantial.

There was a considerable showing that the deceased was not as much impressed with the danger of electric wires as other people are or as he should have been, and the defendant complains of the refusal of numerous requested instructions touching his duty to look out for himself in the presence of such wires, his knowledge and information as to their real character, and the effect of negligence on his part. But a careful perusal of the instructions given, as well as those refused, leads to the conviction that the matter was fairly explained to the jury by the charge given. Instructions 9, 11, 12, 13 and 15 sufficiently and correctly covered the matter of the defendant's contributory negligence.

The facts surrounding the most regrettable affair are such that each party naturally and somewhat justifiably views the situation from her own standpoint and feels that she ought to prevail. The issues were sharply drawn and fairly tried, and the jury under proper instructions reached a conclusion which met the approval of the trial court. Finding no material error in the progress of the litigation the result must stand.

The judgment is affirmed.

Porter, J., dissents.